1

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3   UNITED STATES OF AMERICA,     )   CRIMINAL NO. 02-00307DAE
                                  )
4              Plaintiff,         )   Honolulu, Hawaii
                                  )   April 10, 2006
5         vs.                     )   9:10 a.m.
                                  )
6   LENORA JEAN AITCHISON,        )   DEFENDANT'S MOTION TO
                                  )   SUPPRESS ALL EVIDENCE
7              Defendant.         )   SEIZED, ALL STATEMENTS OF
    _____)   DEFENDANT, AND FOR
8                                     EVIDENTIARY HEARING

9

10                 TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE DAVID ALAN EZRA,
11              UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Government:       MICHAEL KAWAHARA, Esq.
                              Assistant U.S. Attorney
14                            District of Hawaii
                              Room 6100 - PJKK Federal Bldg.
15                            300 Ala Moana Blvd.
                              Honolulu, Hawaii 96813
16

17  For the Defendant:        JACK SCHWEIGERT, Esq.
                              550 Halekauwila Street
18                            Room 309
                              Honolulu, Hawaii 96813
19

20  Official Court Reporter:  Cynthia Fazio, RMR, CRR
                              United States District Court
21                            P.O. Box 50131
                              Honolulu, Hawaii 96850
22

23

24

    Proceedings recorded by machine shorthand, transcript produced
25  with computer-aided transcription (CAT).

# EXHIBIT 10

4

1    search, defendants maintain.  And that during this illegal

2    search there's an interrogation of my client and at the

3    completion of that interrogation she is then read her rights.

4        So the entry onto the property is without a search

5    warrant.  The exception that they're going to be claiming is it

6    was fearing destruction of evidence.

7        THE COURT:  All right.  Well, let me hear from the

8    government.  You might call your first witness if you wish.

9        MR. KAWAHARA:  Yes, the two witnesses I will be

10   calling, Your Honor, are Lt. Kanehailua and Sgt. Hatton.  This

11   goes primarily to the issue of whether Miranda rights were in

12   fact necessary.  To some extent it will also address the issue

13   of what we call the -- it was proper to secure the premises.

14   This is not an exigent circumstance/warrantless search case.

15   This is a case involving the securing of the property based

16   upon probable cause for the purpose of securing a search

17   warrant.

18       And lastly, Your Honor, there's another question I

19   think that -- and that is the issue of, is the defendant

20   entitled to a Franks hearing with respect to the veracity of

21   the warrant affidavits, averments.  And we would suggest that

22   in this regard -- and in particular what we are talking about

23   is the initial observation as of -- of the marijuana from

24   500 feet above ground level.  We suggest that there is no --

25   there is not the substantial preliminary showing to justify

18

1    Q    Okay.  And so you land -- so you landed off the property

2    itself?

3    A    Yes.

4    Q    And what did you do next after landing?

5    A    Officer Hatton and I got out and we instructed Officer

6    Hironaka and the pilot to take off.  And they were going to

7    provide security while we walk onto the property.

8    Q    When you say "security," is that because you weren't sure

9    how many people were on the property at that time?

10   A    Well, at the time we landed there was no way of us to see

11   the structure.  We could see the front portion of the property,

12   but we couldn't see the structure and the individual that was

13   in that area.

14   Q    So how did you -- did you -- after landing did you and

15   Officer Hatton go onto the defendant's property?

16   A    Yes, we did.

17   Q    And how did you do that?

18   A    There was a chain -- a single chain that went across to, I

19   don't know if it was -- I don't remember if it was wood or rock

20   walls, pillars.  We just stepped over the chain and walked

21   right up the front property.

22   Q    Okay.  Now, could the witness be shown --

23        MR. KAWAHARA:  Your Honor, for the record, attached to

24   defendant's Motion to Suppress Evidence is what's marked as

25   Exhibit A, which are several photographs.  I believe defendant

1    has provided to your courtroom deputy similar photographs which

2    I'd like to show to the witness right now.

3            THE COURT:  All right.

4            MR. KAWAHARA:  May I approach the courtroom deputy to

5    identify the photos, Your Honor?

6            THE COURT:  Yes.

7            MR. KAWAHARA:  May I approach the witness, Your Honor?

8            THE COURT:  Yes.

9    BY MR. KAWAHARA:

10   Q    If I could direct your attention to what is marked first

11   as Defendant's D.  There's that yellow tag on the back.  Does

12   that appear to be the front of the -- or the front of the

13   driveway to defendant's property?

14   A    Yes.

15   Q    And does that appear to be the chain that was stretched

16   across the driveway at the time?

17   A    Yes.  Yes, it is.

18   Q    Okay.  Now, if you look on one of the pillars of the chain

19   there seems to be a sign there depicted in this photograph at

20   this time?

21   A    Yes.

22   Q    Was that sign there back on June 27, 2002?

23   A    I did not see that sign.

24   Q    Okay.  Please look at Exhibit --

25           MR. KAWAHARA:  If I may approach, Your Honor, again?

1    BY MR. KAWAHARA:

2    Q    If you could please look at Exhibit -- what is marked as

3    Exhibit B.  It seems that what's depicted there is one of the

4    pillars of the chain and there is a sign there that reads

5    "Posted, no trespassing, keep out."  Do you see that in the

6    photograph?

7    A    Yes.

8    Q    Now, back on June 27, 2002 was that sign as depicted in

9    this photograph present at the front of the driveway?

10   A    No, I didn't see it.

11   Q    You could look at Defendant's Exhibit C.  And what is

12   depicted there is a sign that appears to be on the side of a

13   driveway that says "keep out"; do you see that?

14   A    Yes.

15   Q    Do you recall back on June 27, 2002 seeing such a sign on

16   defendant's driveway?

17   A    I can't remember seeing this sign.  I don't even know

18   where this -- is this a part of the driveway?

19   Q    I'm just asking you if you remember seeing that?

20   A    I don't remember seeing this sign, no.

21   Q    Now, is that a long driveway that leads from the roadway

22   to where the defendant's residence would be located?

23   A    Yeah, it's about 75 yards or so.

24   Q    And did you and Officer Hatton walk along that driveway?

25   A    Yes.

1   Q   And that would be the only egress or exit from that
2   particular -- for that particular residence to the roadway?
3   A   Yes.
4   Q   So if anybody coming to that particular property, how
5   would they have -- how is the only way that they could approach
6   the property to get to the residence from the roadway?
7   A   Walk up that roadway.
8   Q   That driveway?
9   A   That driveway, yes.
10   Q   Now, as you and Officer Hatton walked up the driveway, did
11   you announce yourself in any way?
12   A   Yes.
13   Q   What did you do?
14   A   I -- I was yelling "police, police" all the way up.  We
15   didn't know where the individual was at the time.  Whether he
16   or she was in the bushes, in the structure.  So we made it
17   known that we were police officers walking up.
18   Q   Now, did you -- how were you and Officer Hatton attired at
19   this time?
20   A   We were using our flight suits, which is actually BDUs,
21   dark blue in color with "Police" markings on the back, front.
22   I had my service revolver and some repel gear, which is a
23   harness and a harness that holds the radio on the front.
24   Q   But when you say BDU, was there a camouflage pattern on
25   your flight suit at all or was it just a single blue color?

1    A    Right.

2    Q    By the way, when you see my client, what is she doing at

3    that point in time?

4    A    She's walking out -- at first she's walking out towards,

5    there's that outhouse looking thing up on that little hill.

6    She's walking towards that area.

7    Q    Now, is she dressed at this time?

8    A    Yes, she's dressed.  She has a red -- red colored shirt

9    on.

10    Q    And how about pants, some kind of pants?

11    A    I don't know if she has pants on, but she had a shirt on.

12    She was dressed.  She wasn't --

13    Q    Fully dressed?

14    A    Well, you know, we're flying at 500 to 700 feet, so we can

15    see that she has a shirt on.

16    Q    Could you see whether she's wearing pants?

17    A    I -- I cannot tell you that, yeah.

18    Q    And apparently, this is the way you write it and see if

19    I've got it right.  You say, "I also noticed that there was

20    a" -- "at the time Officer Robert Hironaka and I made a

21    determination," this is apparently you and him together --

22         MR. KAWAHARA:  Just a moment.  Objection, Your Honor.

23    I would appreciate if the quotation is read verbatim from his

24    report rather than the editorializing that is included.

25         THE COURT:  If you're going to quote you should read

1    BY MR. SCHWEIGERT:

2    Q    Now, you indicate that you didn't recall seeing any of

3    those signs that are B, C and D -- or B and C?

4    A    You know, I -- I for sure did not recall seeing that "no

5    trespassing" sign or -- yeah, "posted, no trespassing" sign on

6    D and B.  Now, the "keep out" sign, I don't know where this is

7    located on the property.  I don't believe I've seen it.

8    Q    As you just begin down the driveway there's a "keep out"

9    sign on the right side.

10           MR. KAWAHARA:  Objection, Your Honor.  Is that the --

11           THE COURT:  Sustained.

12   BY MR. SCHWEIGERT:

13   Q    I'm going to ask, as you walked down the driveway did you

14   see any signs?

15   A    No, because we're -- we're looking for the individual.  So

16   we're looking down the driveway at the residence.  I'm looking

17   to my left.  If this is affixed to the right side, I'm not

18   looking to the right.  I don't believe I saw this sign at all.

19   Q    Are you saying that that sign didn't exist?

20   A    I don't know if it existed or not.  I didn't see it.

21   Q    And how about the sign at the front gate, are you saying

22   that that sign didn't exist?

23   A    I'm saying that I did not see that sign.  It was not

24   there.

25   Q    Are you saying it's not there or that you didn't see it?

42

1  A     I didn't see it.  But I don't think it was there at the

2  time.  But you know what, I didn't see it.

3  Q     You know, I did see that you took tons of photographs, it

4  looked like over a hundred.  Would those be photographs that

5  you took?

6  A     I don't --

7  Q     Or -- or Burian took them?

8  A     If you show me the -- if you show me the photographic

9  record, I can tell you exactly who took those photographs.

10  Q     Do you remember seeing a number of photographs taken of

11  the scene?

12  A     You know, I don't remember seeing -- looking at those

13  photographs.

14  Q     Did you see any photographs that took -- that you can

15  recall that showed the front gate?

16  A     No.

17  Q     Or walking down the driveway where this first sign, where

18  Exhibit C might have been located?

19  A     Like I said, I didn't really look at the photographs.

20  Q     Now, as you're going down to the property, apparently

21  you're -- you're actually calling out for -- when you get to

22  the residence -- by the way, you say the residence is about

23  75 yards.  Is it in fact not true that the residence is more

24  like 650 feet, three times your estimate?  You've got it at

25  about 75 yards which is about --

1    BY MR. SCHWEIGERT:

2    Q    Let me rephrase it.  You remember making statements about

3    what you're saying as you're coming down the driveway?

4    A    Yes, I'm -- I'm yelling "police, police," to make sure

5    that the individuals in that area, if there were any other

6    individuals, know that we are police officers coming onto the

7    property.  And at one point I do say "come out," yes, I did.

8    Q    And when you said "come out," do you use it in your report

9    with an exclamation point?

10   A    "Come out."

11   Q    "Come out"?

12   A    Yes.

13   Q    As an affirmative statement by use of the exclamation; is

14   that what your intention was?

15   A    Yes, because we know there's an individual on the

16   property.  So we're asking them to come out.

17   Q    Did you see that individual go into that house?

18   A    No.

19   Q    But you see the individual exit from that house?

20   A    Yes.

21   Q    And what is the individual wearing?

22   A    That same red shirt that I saw earlier from the air.

23   Q    And what -- pants?

24   A    Yeah, she's fully clothed, yes.

25   Q    And you ask her a series of questions at that point in

1          THE COURT:  Yeah, but it would have been nice if you

2     would have given it to him sooner.  Go ahead.

3          MR. SCHWEIGERT:  It's going to be E.

4     (Defendant's Exhibit E was marked for identification.)

5     BY MR. SCHWEIGERT:

6     Q    Now, did -- Lt. Kanehailua, I'm just assuming this is your

7     report.  It looks to be a seven-page report.  And I don't know

8     because I just got it, so...

9          Did I attach Hatton's to there as well or did I just

10    give you yours?

11    A    No, just mine.

12    Q    Okay.  And if you would be able to identify this as your

13    report?

14    A    Yes, it is.

15    Q    Okay.  And I notice that on Page 4 of 7 that it looks like

16    in the top part of the portion you've already gone through your

17    discussion with Attorney Lee Loy and then you've given the

18    phone back to my client and then there's information then being

19    relayed because it says "at that point," not sometime during

20    the -- being on the property, but "at that point."  I'm

21    assuming by your use of your words "at that point," you meant

22    at that point.  Right?  Lt. Kanehailua, have I got that right?

23    A    Yes, I'm sure we all know that, sir.

24    Q    Okay.  And that the -- see if I've got this right and if I

25    read it right.  "At that point," after you've done all of which

1   we've discussed, "I informed Detective Andrew Burian of my

2   information and requested that he attempt to obtain a search

3   warrant to search the structure.  And I also provided him with

4   enough information to get the residence via the ground."

5           Have I read that paragraph correctly?

6   A   Yeah, that's correct.

7   Q   Okay.  Now, did you -- did there ever come a time that you

8   field tested this -- the plants that were there?

9   A   You're going to have to ask the evidence recovery officer.

10  Q   You don't recall doing that yourself?

11  A   I don't -- I'm not the evidence recovery officer.  He

12  would be the one doing that.

13  Q   Now, isn't it also true that when you -- when you then

14  have made the decision to arrest my client, you have to get her

15  back out the driveway because --

16  A   That's correct.

17  Q   And the driveway, the gate, the chain that goes across the

18  driveway is still in an up position as shown in photograph D.

19  Could you look at D?

20  A   Yes, it's --

21  Q   D as in David.

22  A   We had to walk her out because we couldn't get any cars in

23  there.

24  Q   Okay.  So how did you actually exit that gate?  Did you

25  walk over that -- step over --

1    A    Just stepped over it.

2    Q    Okay.

3    A    Just a chain across the road.

4    Q    Was it more than a chain?  Was it a chain with a lock at

5    the end?

6    A    Well, it was locked.  I believe it was locked.  I mean, I

7    don't know.  It was a chain across the road.  We didn't cut it

8    or nothing.

9    Q    I mean there was a lock on it, though, right?  Otherwise,

10   I would assume you would have dropped the chain to walk onto

11   the property?

12   A    No, we wouldn't have.  We just stepped over and walked in.

13   Q    Do you recall asking her if she would be so kind as to

14   unlock that chain?

15   A    Yeah, I think we asked her if we could gain access into --

16   to bring the car in to pick her up.

17   Q    Do you recall asking her to unlock the lock?

18   A    I mean, I don't know if that's what I was -- I don't know.

19   I -- I asked her if we could bring the car in to pick her up

20   and she said no.  So we walked her out.

21   Q    Did you actually have to cut that chain?

22   A    You know, I -- I know that Officer Burian cut the chain

23   with the search warrant to come in.

24   Q    So there was a time during this police operation that that

25   chain was physically cut?

 1           MR. KAWAHARA:  Could the witness be handed Defense

 2    Exhibits B, C and D?

 3           THE CLERK:  (Handing documents).

 4           THE WITNESS:  Thank you.

 5    BY MR. KAWAHARA:

 6    Q    If you'll look at, first of all, Exhibit D, does that --

 7    do you recognize that -- the photograph in Exhibit D?

 8    A    Sir, you're saying D?

 9    Q    Yes.

10    A    It looks to be the defendant's driveway, sir.

11    Q    And is that photograph also -- have you seen that

12    photograph also attached to a defendant's suppression motion in

13    this case?

14    A    A similar photograph, yes.

15    Q    And does that -- and if you look then at Exhibit B, as in

16    bravo?

17    A    Yes.

18    Q    Do you see that there is -- appears to be a sign affixed

19    to one of the posts of the gate that says "posted, no

20    trespassing, keep out"; do you see that?

21    A    Yes, sir, I see it.

22    Q    Back on June 27, 2002, did you see that sign at the front

23    of defendant's property at all?

24    A    No, I did not.

25    Q    Was it present there at all?

1    A    I don't remember seeing that sign, sir.

2    Q    What about if you look at Defendant's Exhibit B, there is

3    a sign that appears to say "keep out" there?

4    A    Are you referring to C, sir?

5    Q    I'm sorry, C.  Yes.

6    A    Yes, I see the photograph.

7    Q    Do you recall back on June 27, 2002 seeing such a sign

8    saying "keep out" on defendant's property?

9    A    No, I do not.

10    Q    Now, at some point in time back on June 27, 2002, was the

11    defendant arrested?

12    A    Yes, sir.

13    Q    Now, according to her declaration filed as part of her

14    suppression motion in Paragraph 20 it says, and I quote:  I

15    then was placed under arrest.  Officer Hiranoka,

16    H-I-R-A-N-O-K-A, then advised me of my rights, unquote.

17         Is that correct?  Who advised defendant of her rights

18    subsequent to her arrest?

19    A    I did that, sir.

20    Q    And how did you advise defendant of her rights?

21    A    I told the defendant "I'm a police officer.  I want to

22    inform you of your rights.  You have the right to remain

23    silent.  You don't have to answer any questions.  Anything you

24    say can be used against you in court.  You have the right to

25    talk to a lawyer."  I told the defendant that "you could have

1    A    Good morning, sir.

2    Q    When -- when you were in that helicopter with Officer --

3    or Lt. Kanehailua, did you see any action on the property?

4    A    I saw a person standing by the eave of the house on the

5    ground.

6    Q    If you take a look at Exhibit A in front of you.  Just so

7    we're on the right page.

8    A    Oh, sorry, sir, I didn't have A.  I have it now.

9    Q    Okay.  I'm sorry.  That's actually my fault.

10         As you look at Exhibit A, there's -- there's a large

11    white square when you compare it to all the other items.  Where

12    in relation to that large white square would she have been?

13    A    I would say that she was -- the person that I saw was at

14    the -- would be the top left-hand side and then you have, like,

15    that clearing place.

16    Q    Why don't you --

17    A    -- I remember seeing the person.

18    Q    Okay.  Let's use the green -- there's -- see an extra one?

19    Why don't you take the green marker and mark it on A1 where you

20    see my client.  And by the way, just so I'm confirming, it was

21    my client that you saw, Ms. Aitchison?

22    A    Sir, from the height that the helicopter was flying I just

23    could see that it had the shape and form of a person.  I

24    couldn't tell if it was male or female or any distinguishing

25    features on the face.  It was -- we were high in the

1    helicopter.  I could tell it was a person.

2    Q    Could you tell what she was wearing?

3    A    I don't recall, sir.

4    Q    Okay.  By you don't recall, you're not saying -- you just

5    have no memory of what she was wearing at this point in time or

6    you just couldn't see what she was wearing at this point in

7    time?  Because it could be interpreted two ways.

8    A    I would say that I -- I couldn't see.  There wasn't

9    anything real conspicuous or striking, like an orange or

10    something that would stick out.  I don't remember anything like

11    that, sir.

12    Q    And does this object -- it's mostly then, you can tell

13    it's a person, you can't see what they're wearing other than

14    it's a person.  Could you tell it's a man or a woman?

15    A    No, I couldn't tell at that point, sir.

16    Q    And -- and is that body moving as you see it or is it

17    stationary?

18    A    When I saw the person, it seemed as if they were standing

19    under the eave of the home.  I don't remember any movements.

20    Q    Okay.  And had -- had you been hovering over this property

21    at -- for any period of time before you're now making these

22    statements?

23        MR. KAWAHARA:  Objection.  "Before you're now making

24    these statements"?

25        MR. SCHWEIGERT:  As far as points in time.

1    one that you've marked but just Exhibit A, if you can tell us,

2    Officer Hatton, where does the helicopter land?

3    A    In the roadway, sir.

4    Q    Okay.  And I picked up that you don't recall seeing any

5    signs posted of no trespassing or keep out.  Are you saying

6    that there weren't signs posted or that you just don't recall

7    seeing signs posted?

8    A    I didn't see any signs, sir.

9    Q    Did you ever see any photographs taken of this area of

10   the -- of the -- my client's property that might clear this up

11   as to whether there were signs posted or not?

12   A    I saw the photograph that was included in your client's

13   declaration.

14   Q    But other than that you've seen no photo -- I'm talking

15   now mostly for purposes of the police.  Did you see whether the

16   police had taken any photographs?

17   A    No, I didn't see those photographs, sir.

18   Q    Now, as you go onto the property you actually had to

19   physically cross over a chain?

20   A    That's correct, sir.

21   Q    And that chain was locked?

22   A    Yes, sir.

23   Q    In fact that chain actually got cut by police sometime

24   during the period of time of the search of the property to

25   enable, I guess, vehicles to go on down?

1    A    Another officer would have been responsible for that, sir.

2    I --

3    Q    Do you know that that happened?

4    A    Yes, sir.

5    Q    I also notice that, in your report that I got on Friday

6    afternoon, that there was a cell phone actually in a red car;

7    do you remember that, a Mustang?

8    A    A Mustang convertible.

9    Q    And what color was that Mustang?

10    A    Red.

11    Q    Okay.  And it was a cell phone, this is picked up by my

12    client so she could call her lawyer?

13    A    Yes.

14    Q    And did you notice whether she actually had to physically

15    unplug the phone to be able to use it?

16    A    I don't remember if she -- if it had a charger.  I don't

17    remember, sir.

18    Q    If she was to testify that she did actually physically

19    have to undo that charger, you would have no independent

20    recollection one way or the other?

21    A    No, I would not.

22    Q    Okay.  And is it perhaps possible that when you first

23    looked down and see the individual that you're saying is my

24    client, although you didn't recognize her at the time as even a

25    man or a woman, that she was under an eave and not actually

1    sitting in that car using that phone?

2    A    Sir, I -- I specifically remember a person under the eave

3    of the house.  I don't remember seeing anyone in the car.

4    Q    And when you approached the house, isn't it in fact true

5    that my client is in the house and is coming out to Officer

6    Kanehailua's shouting to come out?

7    A    Yes, sir.

8    Q    Did you also actually watch my client dress when she

9    changed, she had to put some clothes on, do you remember her

10   doing that?

11   A    No, sir, I didn't watch her dress.

12   Q    When you saw my client approach, what was she wearing when

13   you first come onto the --

14   A    She had on a t-shirt and jeans.

15   Q    What was the color of the t-shirt?

16   A    It was kind of like an off-white color.

17   Q    Then before she -- before -- now, do you remember that

18   there came a time that she is going to be arrested and taken

19   off the property, before that happened do you recall her

20   actually having to put the top back up on the -- on the red

21   convertible?

22   A    She had requested to do that when she got her phone, sir.

23   Q    To -- at that point in time she's going to be arrested?

24   She knows that she's going to be arrested when she's putting

25   her top up?

1    Q    What did you do?

2    A    I was getting dressed and then I came out, I opened the

3    door and came out on the porch.

4    Q    Okay.  And one of the officers that -- you mention in your

5    declaration was filed in here that there was an Officer

6    Kanehailua and an Officer Hironaka.  You heard this morning --

7    A    Yes.

8    Q    Was it Officer Hironaka, was that the second officer?

9    A    No, I -- I guess I made an honest mistake about the name.

10   I realized it was Hatton.  I --

11   Q    You saw the individual take the stand today and that's the

12   second individual?

13   A    Yes, that was him.

14   Q    For those officers to come down your driveway was your

15   driveway in any way secure as to block people from coming onto

16   your property?

17   A    Yes, I had two cement pillars with a heavy duty chain

18   across the gate with a lock.

19   Q    And on this day, June 27th, 2002, was that -- at this

20   point in time was that chain locked?

21   A    Yes.

22   Q    Okay.  And was there -- you notice Exhibit D -- you don't

23   have it there.  If you'll take a look at Exhibit D?

24        MR. SCHWEIGERT:  I'm going to show them all to her,

25   Richlyn.

```
 1            THE CLERK:  Pardon?

 2            MR. SCHWEIGERT:  I'm going to show her B, C and D.

 3   And actually A, too.  So you might as well just...

 4   BY MR. SCHWEIGERT:

 5   Q     Would you take a look at Exhibit D and tell the court if

 6   that's the chain link or chain, chain that goes across your

 7   driveway?

 8   A     Yes.  Yes, it is.

 9   Q     And looking at this picture, this is looking towards your

10   property or away from your property?

11   A     Toward it.

12   Q     So this is the driveway that enters into your property?

13   A     Yes, this is the front gate in front of the road.

14   Q     Now, if you'd take a look at another exhibit that's up

15   there with you, this is Exhibit B, as in bravo, and can you

16   tell me whether on June --

17            THE COURT:  Are these pictures that she took at some

18   point or are these pictures the police took?

19            MR. SCHWEIGERT:  These are pictures she took, Your

20   Honor.

21            MR. KAWAHARA:  Maybe she should testify to that, Your

22   Honor.

23            THE WITNESS:  This is an area --

24            THE COURT:  Huh?

25            MR. KAWAHARA:  Maybe she should testify to that so we
```

1    can authenticate --

2              THE COURT:  Yeah, I have no idea --

3              MR. SCHWEIGERT:  Thank you.  Thank you, Your Honor.

4    BY MR. SCHWEIGERT:

5    Q    As to Exhibit D, who took that picture, D with the chain?

6    A    Not I.

7    Q    I'm sorry?

8    A    Not I.  This is an aerial photo.

9    Q    No, no, I'm going to go back over the exhibits we just did

10   and I'm going to establish who took the pictures.

11             Exhibit D with the chain across the driveway, who took

12   that picture?

13   A    I did.

14   Q    Okay.  Was that nonetheless the way the chain was on June

15   27th, 2002?

16   A    Yes.

17   Q    Okay.  I'm going to show -- now I want you to take a look

18   at Exhibit B and C.  Do you recognize pictures B and C?

19   A    Yes.

20   Q    Who took pictures B and C?

21   A    I took these pictures.

22   Q    Okay.  And was this picture as indicated in Exhibit B

23   where it says posted:  "No trespassing, keep out," is that the

24   area that that sign was located on June 27th, 2002?

25   A    Yes, it is, except for it's tilted a little ways because

1    my son had built a rock wall there and he tilted it up.

2    Otherwise it would have been straight across in the same

3    position.

4    Q    So that that rock wall would not have been there on June

5    27th, 2002?

6    A    No.

7    Q    But the pillar that the chain is hooked to would have been

8    there on June 27th?

9    A    Yes, along with the sign.

10    Q    Along with the sign.  And as to Exhibit C, who took

11    Exhibit C?  Exhibit C.

12    A    I did.

13    Q    And was that sign posted on your property on June 27th,

14    2002?

15    A    Yes.

16    Q    Now, if you can take a look at Exhibit A, which I know you

17    didn't --

18            MR. SCHWEIGERT:  Which one is the aerial?

19            THE COURT:  I don't know, she's got them over there.

20            THE CLERK:  She has it all.

21            THE WITNESS:  I have A1.

22    BY MR. SCHWEIGERT:

23    Q    Yes.  The aerial -- if you -- if you take a look at A1

24    where we've already put a mark on it?

25    A    Yes.

1    Q    Okay.  Can you -- can you tell the court where Exhibit C

2    would be located on this -- on this picture?

3    A    Okay.  Exhibit C is right in front -- right behind the

4    front chain gate on the right on a tree.  You can see it right

5    there from the chain.  It's right inside the gate on the right

6    within about 10 feet.

7    Q    So as you look down the driveway?

8    A    Yes.

9    Q    From the chain area?

10   A    Yes.

11   Q    You're saying that you can see that second sign?

12   A    Yes.

13   Q    And both the sign that's indicated in Exhibit B and the

14   sign that's indicated in Exhibit C were posted on June 27th,

15   2002?

16   A    Yes, most definitely they were.

17   Q    Okay.  Were there any other "keep out" signs or posted

18   signs on your property on June 27, 2002?

19   A    Yes, there were.

20   Q    Where would those signs have been?

21   A    There was one -- there were three on each side of the gate

22   starting at the beginning of my property up the road, one, two,

23   three, and then the driveway.  And on the right side it was

24   one, two, three, to the other end of my property on the

25   driveway --

1  Q    Ms. Aitchison, if you could look at Defendant's Exhibits B

2  and C which are in front of you?

3  A    Yes.

4  Q    Do you see those?  Those are the photographs that you've

5  testified that you took?

6  A    Yes.

7  Q    And those two photographs, B and C, reflect signs that you

8  say were on your property?

9  A    Yes, sir.

10  Q    Now, when did you take those photographs?

11  A    Oh, I don't remember.

12  Q    You don't remember.  And if you don't remember when you

13  took these photographs --

14  A    Mm-hmm.

15  Q    -- can you please explain to us how you can remember --

16  A    There was approximately one --

17  Q    Excuse me, listen to the question, please.

18  A    Oh, I'm sorry.

19  Q    If you can't remember when you took these photographs now,

20  can you please explain to us how you specifically know that

21  those signs were there back on June 27, 2002?

22  A    When I first bought the property I posted my whole

23  property with "no trespassing" signs.

24  Q    May I ask you the next question, ma'am.  You know,

25  attached to the suppression motion that Mr. Schweigert filed on

1                    COURT REPORTER'S CERTIFICATE

2

3          I, CYNTHIA FAZIO, Official Court Reporter, United

4    States District Court, District of Hawaii, Honolulu, Hawaii, do

5    hereby certify that the foregoing pages numbered 1 through 108

6    is a correct transcript of the proceedings had in connection

7    with the above-entitled matter.

8          DATED at Honolulu, Hawaii, May 21, 2006.

9

10

11                      _____/s/ Cynthia Fazio_____
                        CYNTHIA FAZIO, RMR, CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25